```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Aspen Ford
                Plaintiff,

    - against -

Ford Motor Company                              CV-01-4677 (CPS)
                Defendant.                      CV-99-5978 (CPS)

----------------------------------------X       MEMORANDUM
                                                OPINION AND ORDER
Universal Ford
                Plaintiff,

    - against -

Ford Motor Company
                Defendant.

----------------------------------------X
```

SIFTON, Senior Judge.

Plaintiffs L&B Lincoln Mercury, Inc. ("L&B") and McCarville Ford Inc., ("McCarville")[1] bring this action against the Ford Motor Company ("Ford"), seeking damages and injunctive relief for alleged violations of §465 of the New York Vehicle and Traffic Law ("NYVTL") and breach of contract. In substance, plaintiffs claim that Ford failed to reimburse them for parts used to make

---

[1] This case includes 16 other plaintiffs besides L&B and McCarville: Aspen Ford, Inc., Bright Bay Lincoln Mercury Inc., Hempsted Lincoln-Mercury, Koeppel Ford Inc., McDaniel Ford Inc., Popular Ford Inc., Smithtown Ford Inc., Tower Ford Inc., Dan Buckley Ford Inc., R.C.Lacy, Inc., Patchogue Motors, Inc., Wantagh Ford, Inc., Morningstar Ford, Inc., Johnson Ford Inc., Universal Ford, Inc., and Bill Kolbe Jr. However, the parties entered into a stipulation, so-ordered by Magistrate Judge Gold on November 14, 2003, agreeing that L&B and McCarville would serve as "test" plaintiffs. Discovery is stayed as to the other plaintiffs pending resolution of L&B and McCarville's claims. The parties will be bound by any legal decisions in the L&B and McCarville cases, but to the extent other plaintiffs present different factual circumstances, the factual findings in this case will not bind those plaintiffs.

repairs covered by Ford's consumer warranties in amounts required by statute. Now before the Court is Ford's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, on the ground that plaintiffs' failure to submit claims in conformity with Ford's procedures for reimbursement demands for parts used to make repairs covered by Ford's consumer warranties precludes recovery, and that Ford's procedures are not invalidated by §465 of the NYVTL. Ford also argues that the contract clause of United States Constitution bars recovery by plaintiff McCarville and that the statute of limitations bars recovery for claims which arose more than three years before L&B joined the law suit. Ford also asserts the defenses of waiver, estoppel, and account stated preclude liability.  For the reasons discussed below defendant's motion for summary judgment is granted.

BACKGROUND

The following facts are taken from the submissions of the parties in connection with this motion including affidavits, agreements, letters, and statements of undisputed material facts, and are undisputed unless otherwise noted.

Test case plaintiffs L&B and McCarville are engaged in the business of selling and servicing Ford automobiles in the State of New York where they are incorporated and have their principal place of business. Defendant Ford is engaged in the business of manufacturing automobiles, including Ford and Lincoln-Mercury

model vehicles. It is incorporated and has its principal place of business in Michigan.

Plaintiffs each operate under a Sales and Services Agreement (the "Agreement") with Ford which details the rights and obligations of both Ford and the dealers. McCarville entered into such an Agreement on June 1, 1972. L&B last entered into Mercury and Lincoln Agreements on July 29, 1997.

Pursuant to the Agreements, L&B and McCarville provide parts and labor at no cost to customers whose vehicles are repaired under warranty from Ford. The Agreements provide that Ford will reimburse its dealers for warranty work and incorporate by reference Ford's Warranty and Policy Manual (the "Manual"). The Manual sets out Ford's policies and procedures for the submission of claims for warranty work and explains how dealers are to be paid. The Manual is distributed to Ford, Lincoln, and Mercury Dealers nationwide and to plaintiffs L&B and McCarville in particular.

Under §4(1)(b)(1) and (4) of the standard provisions of the Agreement:

> (1) The Dealer shall perform all warranty and policy service on each COMPANY PRODUCT it is certified to sell and service, presented by owners, in accordance with the warranty and policy applicable thereto and the appropriate provisions of the Warranty Manual and CUSTOMER SERVICE BULLETIN.
> 
> ***

> (4) The Dealer shall submit claims to the Company for reimbursement for the parts and labor used in performing warranty, policy and campaign work and the Company shall reimburse the Dealer in connection therefor, in accordance with the provisions of the Warranty Manual or campaign instructions and the Dealer's approved Warranty labor rate. The Dealer shall maintain adequate records and documents supporting such claims in accordance with the provisions of the Warranty Manual.

(Peterson Dec. Ex. C. at 6447).

To be paid for the parts and labor expended on a warranty repair, L&B and McCarville, like all dealers under contract with Ford, must submit a claim to Ford within 90 days of the date of the repair.[2] (Barry Dec. Ex. C [2003 Manual]). After reviewing the claim, Ford pays the dealer for parts at a thirty to forty percent markup, with parts used for 1994 and later model vehicles reimbursed at a forty percent markup, as specified in the applicable National Warranty Parts Reimbursement Policy (the "National Reimbursement Policy"). The National Reimbursement Policy is distributed annually to all Ford dealers nationwide.

Pursuant to the Manual, in order to submit a claim for reimbursement, L&B, McCarville, and other dealers nationwide, are required to submit certain information, such as repair order number, part price, and vehicle identification number, to Ford's computerized Direct Warranty Entry System ("DWE"). Once a claim

---

[2] 120 days for claims submitted between October 1, 2002 and September 30, 2003, and 180 days for claims submitted before October 1, 2002. (Barry Dec. Ex A [1998 Manual]), Ex B [2001 Manual]).

is submitted via DWE, Ford's Automated Claims Editing System ("ACES II") reviews it for accuracy and may edit information included in the warranty submission. Thus, if in the process of submitting a warranty claim via DWE L&B, McCarville or another dealer inputs a part price that deviates from the price for that part set forth in the National Reimbursement Policy, ACES II overrides the price set forth in the submission and replaces it with the National Reimbursement Policy price. Ford processes 50,000 to 75,000 warranty claims a day from Ford dealers nationwide. In the State of New York, Ford receives approximately 2,000 warranty and service contract claims each day.

L&B and McCarville routinely submit electronic claims for warranty reimbursements through DWE. 84% of all claims submitted to DWE are paid overnight without review by Ford personnel. Dealers generally get a "register" (in essence an electronic statement of account) the next day indicating that a warranty claim has been paid. If a dealer is dissatisfied with a warranty payment, it has 120 days to appeal the payment. (Barry Dec. Ex. C [2003 Manual].[3]

In 1992, New York amended §465 of its Vehicle and traffic law to require manufacturers, like Ford, to reimburse both labor

---

[3] At oral argument defense counsel explained that this "appeal" procedure allows the dealer to file an electronic "appeal" requesting additional reimbursement. In contrast to regular claims filed in the DWE system, these "appeals" are reviewed in person at Ford, not electronically.

and parts under warranty contracts at reasonable market rates.[4]

The statute provides in its entirety:

> 1. Every franchisor shall properly fulfill any warranty agreement and/or franchisor's service contract and shall compensate each of its franchised motor vehicle dealers for warranty parts and labor in amounts which reflect fair and reasonable compensation for such work. All warranty claims and/or claims under a franchisor's service contract made by franchised motor vehicle dealers shall be paid within thirty days following their approval provided, however, that the franchisor retains the right to audit such claims for a period of two years following the submission thereof, and to charge back any amounts paid on false, fraudulent, incorrect or unsubstantiated claims. For parts, other than components, systems, fixtures, appliances, furnishings, accessories and features of a house coach that are designed, used and maintained primarily for nonvehicular residential purposes, and labor reimbursement, fair and reasonable compensation shall not be less than the price and rate charged by the franchised motor vehicle dealers in the community or marketing area for like services to non-warranty and/or non-service contract customers, provided such price and rate are reasonable.
>
> 2. All warranty claims shall be either approved or disapproved within thirty days after their receipt. When any such claim is disapproved the franchised motor vehicle dealer shall be notified in writing of its disapproval within said period. Each such notice shall state the specific grounds upon which the disapproval is based.

N.Y. Veh. & Traf. Law § 465 (McKinney's 1996).

To comply with the 1992 amendment to §465, Ford promulgated a Supplemental Reimbursement Policy ("Supplemental Policy") applicable to New York franchised dealers to permit the dealers to submit claims for warranty reimbursement at prices higher than

---

[4] The prior version of §465 applied to labor but not parts.

those set forth in the National Reimbursement Policy. Under the Supplemental Policy, a dealer which seeks reimbursement at prices higher than those permitted by the National Reimbursement Policy must submit a claim that references the particular warranty repair performed, states the rate the dealer charges its non-warranty customers for any part used in the repair, substantiates that rate by including five[5] non-warranty, customer-paid orders for the part or a similar part, states the dealer's parts markup, and identifies non-Ford franchised dealers in the dealer's community or marketing area. If a dealer submits a claim in conformity with these requirements, Ford determines whether the price requested by the dealer is reasonable and, if it is, reimburses the dealer for the amount requested.

Ford does not automatically provide New York Ford-franchised dealers with a copy of its Supplemental Policy. Rather, Ford provides a dealer with a copy of the Supplemental Policy only if the dealer submits to Ford a written request for reimbursement for a part used in a warranty repair at retail prices in excess of the price set forth in the National Reimbursement Policy for that part. To date, Ford has provided approximately fifteen of the 388 Ford or Lincoln-Mercury dealers in New York with a copy of its Supplemental Policy.

---

[5] If a dealer cannot find five sales orders for similar parts the dealer may submit a supplemental claim with fewer sales orders. Rubin. Decl. Ex. 14, Ex. 15.

L&B and McCarville both knew of Ford's Supplemental Procedure. (Rule 56.1 ¶27, 34, 44-49). However, neither L&B or McCarville has ever submitted a claim under the Supplemental Procedure. (Rule 56.1 ¶26). Both L&B and McCarville are members of two car dealer associations, the Greater New York Automobile dealers Association ("GNYADA") and the New York State Automobile Dealers Associations ("NYSADA"). Both associations were involved in lobbying for the 1992 amendment to §465. The NYSADA publicized the amendment to its members when it was enacted. L&B regularly receives newsletters from the two associations, and L&B's president generally reviews newsletters when they are received. Since 1992, these newsletters have apprised dealers of their rights under §465. In addition a NYSADA newsletter specifically described Ford's Supplemental Procedure. Moreover, McCarville's president, Bart McCarville, was a member of the NYSADA's executive committee that helped draft the proposed 1992 amendments and knew that §465 was amended to address warranty parts reimbursement.

From the amendment of §465 in 1992 until 2001 neither dealer notified Ford that they were dissatisfied with amounts of reimbursement for parts under their warranty claims. McCarville's president stated that he did not complain because he "did not want to go out on a limb" or "to shake the tree" by asking for additional amounts, stating "I have been a . . .Ford dealer for

almost 50 years and one reason that I'm still a Ford dealer today is that I have learned not to make too many waves." (McCarville Dep. 129-130).

By letter dated August 21, 2001, L&B first informed Ford of its dissatisfaction with the supplemental reimbursement policy and specifically asked that Ford reimburse L&B in compliance with the mandates of §465. L&B stated that it specifically objected the Ford's supplemental reimbursement policy because the policy "places the burden on L&B to particularize claims and submit detailed evidence of the non-warranty retail price for each part in question charged by franchised motor vehicle dealers in L&B's community."[6] L&B also stated:

> Notwithstanding the foregoing, we wish to emphasize that no waiver, accord or satisfaction may be inferred from L&B's past or future resort to Ford's claims submission process as it is presently constituted, nor the past or future acceptance of payments under protest thereunder.

On July 12, 2001, L&B filed suit against Ford. On August 2, 2002, McCarville joined the suit.

## DISCUSSION

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©)

---

[6] In fact, as noted below, such evidence is only required with respect to the dealer's own price, not with respect to the dealer's competitors.

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). All facts and inferences are to be viewed in the light most favorable to the party opposing the motion, *see Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001).

Ford argues that under its Supplemental Reimbursement Policy, retailers are required to submit a claim for warranty reimbursement which states the amount of reimbursement requested for each part, substantiates that rate as the rate charged non-warranty customers and supplies information with respect to the identity of local competitors in order to permit Ford to determine whether the rate is reasonable. Since L&B and McCarville submitted claims through DWE, they failed to comply with these requirements and Ford may properly refuse reimbursement without violating the provisions of Section 465 of the NYVTL.

This issue was addressed but not decided in my October 31,

2001 opinion on a prior summary judgment motion in this case. *Universal Ford Inc., v. Ford Motor Company*, 2001 WL 1502994. However, that opinion is not controlling here because I decided that case on the ground that Ford never notified the dealers of its supplemental policy and the dealers never learned of it. In contrast, in the present case, it is undisputed that the dealers were aware of the supplemental reimbursement policy.

The text of §465 does not offer guidance as to which party should bear the burden of calculating a "reasonable" price. Where the text of a statute is unclear, courts look to the legislative history. N.Y. Stat § 92; N.Y. Stat §93 (directing courts to consider the "mischief" sought to be remedied by legislation and to construe legislation to "advance the remedy.") On one hand, the legislative history demonstrates that the "primary goal" of the 1992 amendment to §465 was "to provide greater protections to motor vehicle dealers operating under franchise agreements with manufacturers." 2 McKinney's 1992 Session Laws of N.Y. at 2899. On the other hand, the governor's memorandum approving the 1992 amendment states that the amendment was not meant to place "any undue burdens on manufacturers." Id.  Further legislative history indicates that the attorney general was concerned that

> [b]y requiring the systematic collecting of price information [§465's] language has the potential of creating the opportunity or incentive for dealers to collude or fix the prices for replacement parts. However, existing law establishes the same standard for labor service, and, to date, this provision does not

>  appear to have occasioned any unlawful or anti-
>  competitive behavior on the part of franchised motor
>  dealers.

Legislative Bill Jacket for 1992 Laws Ch. 521 at 21. As I have noted before "[t]his language appears to indicate . . .that prior to the 1992 amendments, dealers collected labor rate information under §465. Nothing in §465's history indicates that the legislature intended to alter this practice." *Universal*, 2001 WL 1502994 at *5.

No New York state case has interpreted §465. The one New York federal court to do so, *Ralph Oldsmobile*, 2000 WL 1459767 (S.D.N.Y. 2000), concluded that, "the burden of complying with §465 falls entirely on manufacturers in light of the statute's language and legislative history" and the dealer is not required under §465 to submit "claims particularizing the amount [it] sought as reimbursement for parts used in warranty repairs. 2000 WL 1459767 at *5. However, for the reasons set forth in the Attorney General's comments on the legislation I am not persuaded that the interpretation of §465's legislative history by the *Ralph Oldsmobile* Court is the last word on the subject. Accordingly, I turn to an examination of case law interpreting New Jersey, Maine and Ohio statutory provisions which resemble §465.

Those cases all support Ford's contention that the dealer must request specific payment rates. In *Liberty Lincoln-Mercury*

*v. Ford Motor Co.*, 134 F.3d 557 (3d Cir. 1998), the Third Circuit noted, in the process of interpreting the New Jersey Franchise Practice Act, that "colorable authority [exists] for requiring dealers to establish retail rates on a part-by-part basis. Similarly, in *Darling's v. Ford Motor Co.*, 719 A.2d 111 (Maine 1998), the Supreme Judicial Court of Maine, citing *Acaia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 828 (D.Me. 1994), *aff'd in part and remanded,* 44 F.3d 1050 (1st Cir. 1995), noted that a "dealer must submit a claim that is sufficiently individualized to enable a manufacturer to satisfy [its] obligations" under 10 M.R.S.A. §1176. Finally, in *Jim White Agency Co. v. Nissan Motor Corp.,* 126 F.3d 832, 836 (6th Cir. 1997), the Sixth Circuit affirmed the district court's grant of summary judgment to the manufacturer, holding that the dealer, "waived its right to retail payment on previously submitted warranty claims because it had failed to request payment at rates other than cost plus a 30% markup, the amount stated in the dealership contract."

The present case might be distinguished from the Ohio, Maine and New Jersey cases because the statutes at issue in those cases required reimbursement at a franchisee's retail rates, not at the prevailing rates in the franchisee's community or marketing area, as the New York statute requires. It is arguably a lesser burden to require dealers to provide evidence of their own rates than to ask dealers to survey their community or market in order to

provide those rates. However, despite the language of the New York statute, in the present case, Ford's supplemental reimbursement policy does not require that dealers conduct market research in order to determine a reimbursement price. A dealer can request a price above Ford's national reimbursement policy by submitting documentation of its own non-warranty customer bills for that product, stating the dealer's overall markup on the part and providing the names of non-Ford franchised dealers in the dealer's community or marketing area. Once a dealer submits this evidence Ford has the burden of determining if the requested rate is in fact prevalent in the dealer's area and reasonable.

Thus, in practice, Ford's policy parallels the operation of the New Jersey, Ohio and Maine statutes which require the dealer to provide only his own standard rates. As between the dealer and the manufacturer, it must be the dealer who is responsible to provide his own rates, as the manufacturer will not have access to that information without the cooperation of the dealer. Indeed, while the *Ralph Oldsmobile* court held that the dealer did not have to provide a particular price in order to be entitled to statutory reimbursement rates under §465, that court contemplated an exception in just this situation, that is, where "GM [the manufacturer] had requested Ralph's [the dealer] parts prices to calculate the reasonable price for Ralph's community and Ralph had refused." *Ralph Oldsmobile*, 2000 WL 1459767, at 7. In the

present case, Ford's supplemental policy requested evidence of the dealer's parts prices and the dealers refused to provide that information by refusing to submit claims through the supplemental policy procedures.

It remains an open question, and one which need not be decided at this juncture, whether Ford could deny a claim on the ground that the rate was not the price charged by other dealers in the dealer's community or marketing area and require the dealer to prove the going rate in the community or marketing area. Arguably, Ford would be able to deny a reimbursement claim only if *Ford* could prove the going rate in the community or market, because while the burden is on the dealer to offer evidence of his own rates, the burden is on the manufacturer to compile evidence of community rates, if it does not want to pay the dealers own usual rates.

Because I conclude that a dealer may be required under §465 to provide evidence of its own pricing to a manufacturer, and grant summary judgment to the defendant on that ground, I do not address defendant's argument that there are no damages in this case, and accordingly, no liability, because properly calculating the statutorily mandated price under §465 would show that the prices paid by Ford under its national reimbursement policy were not lower than prevailing rates in the dealer's communities or

marketing areas.[7] I also do not reach any of defendant's affirmative defenses nor do I address defendant's contracts clause or statute of limitations arguments.

CONCLUSION

For the reasons set forth above defendant's motion for summary judgment is granted.

The Clerk is directed to transmit a copy of the within to the parties and to the Magistrate Judge and to enter judgment in favor of defendant.

Dated :   Brooklyn, New York

   March 28, 2006


By: /s/ Charles P. Sifton (electronically signed)
    United States District Judge

---

[7] Ford argues that a proper calculation of prevailing community rates would consider not only the price paid to dealers for products by retail customers, but also the price paid for parts sold to retail repair customers (when no labor on the part of the dealer was involved), parts sold to retail over the counter parts customers, and parts sold to wholesale customers.